Bruce L. Simon (Bar No. 96241)
Jessica L. Grant (Bar No. 178138)
PEARSON SIMON WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel: (415) 433-9000
Fax: (415) 433-9008
Email: bsimon@pswplaw.com
       jgrant@pswplaw.com

Garrett D. Blanchfield, Jr.
REINHARDT WENDORF & BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN  55101
Tel: (651) 287-2100
Fax: (651) 287-2103
Email: g.blanchfield@rwblawfirm.com

*Counsel for Plaintiff and the Proposed Classes*

[Additional counsel listed on signature page]

*E-filing*

FILED

ISS

NOV 1 3 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MEJ

CV 09 5372

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL JACOBSON, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (a/k/a the "NCAA"); and COLLEGIATE LICENSING COMPANY (a/k/a "CLC"), | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**INTRODUCTION**

1.    Plaintiff and putative Class Representative Samuel Jacobson ("Sam Jacobson" or "Plaintiff") brings this action both individually and on behalf of damages and injunctive relief classes (collectively, the "Classes") consisting of former student-athletes who competed for National Collegiate Athletic Association "("NCAA") member colleges or universities on those schools' (1) "Division I" men's basketball athletic teams; and (2) "Football Bowl Subdivision" (formerly known until 2006 as "Division I-A") men's football athletic teams whose images have been licensed or sold by Defendants, their co-conspirators, or their licensees during the four years preceding the filing of this Complaint (the "Class Period"), or may be in the future.  For purposes of the injunctive relief class only, Plaintiff also brings this action on behalf of current student-athletes competing on the teams described above, as well as former student-athletes, as both groups' future compensation rights are impacted by the anticompetitive practices described herein.

2.    Defendants NCAA, the Collegiate Licensing Company (the NCAA's licensing arm), and their co-conspirators, including the NCAA's members schools and conferences, have committed *per se* violations of the federal antitrust laws by engaging in a price-fixing conspiracy and a group boycott / refusal to deal that has unlawfully foreclosed class members from receiving compensation in connection with the commercial exploitation of their images following their cessation of intercollegiate athletic competition.  Plaintiff also sets forth a claim for unjust enrichment and requests that the Court require Defendants to provide an accounting of ill-gotten gains and the monies unlawfully withheld from class members.  Plaintiff further requests that the Court establish a constructive trust for the benefit of class members and for the purpose of holding in trust the licensing revenues that Defendants and their co-conspirators have unlawfully diverted from class members.

3. As utilized herein, the term "former student athletes" includes those individuals that have permanently ceased competing on teams because of, for example, graduation; exhaustion of eligibility; injury; voluntary decisions to cease competition; and involuntary separations from teams due to decisions by coaches, schools, conferences, and/or the NCAA, and also includes those individuals that subsequently became professional athletes, whether prior to or after the exhaustion of their intercollegiate eligibility, and further includes current students that have remained in school but ceased competing on a collegiate athletic team.

4. The term "Damages Class" refers to former student-athletes as described herein. The term "Declaratory and Injunctive Relief Class" includes both former and current student-athletes as described herein. The terms "Class" or "Classes" include both Damages and Declaratory and Injunctive Relief class members, unless otherwise specified.

5. Defendant NCAA describes itself as "the organization through which the colleges and universities of the nation speak and act on athletics matters at the national level" and states that it is a "voluntary association of more than 1,000 institutions, conferences and organizations." The NCAA's official "licensing representative" is a for-profit entity called The Collegiate Licensing Company ("CLC"), a defendant herein, which is a division of IMG Worldwide, Inc. ("IMG"). CLC states on its website that there is a "$4.0 billion annual market for collegiate licensed merchandise."

6. As described below, the NCAA has unreasonably and illegally restrained trade in order to commercially exploit former student-athletes previously subject to its control, with such exploitation affecting those individuals well into their post-collegiate competition lives. The NCAA's conduct is blatantly anticompetitive and exclusionary, as it wipes out in total the future ownership interests of former student-athletes in their own images -- rights that all other members of society enjoy -- even long after student-athletes have ceased attending a university.

CLASS ACTION COMPLAINT - 3 -

7. The NCAA's business partner, Thought Equity Motion, has described the NCAA's video content archive as "one of the most unique and valuable content collections in the world." The NCAA, through its member conference and schools, and in conjunction with its for-profit business partners, has eliminated the rights of former student-athletes to receive even a single dollar from the substantial revenue streams described herein. Former-student athletes do not share in these revenues even though they have never given informed consent to the widespread and continued commercial exploitation of their images. While the NCAA, its member conferences and schools, and its for-profit business partners reap millions of dollars from revenue streams including television contracts, rebroadcasts of "classic" games, DVD game and highlight film sales and rentals, "stock footage" sales to corporate advertisers and others, photograph sales, video game sales, and jersey and other apparel sales, former student-athletes whose likenesses are utilized to generate those profit-centers receive no compensation whatsoever.

8. Only within recent years has the NCAA entered into some of the licensing partnerships detailed herein that unlawfully utilize the images of Class members. The related available content featuring likeness of former student-athletes, such as DVDs, photos, and video games, continues to grow in both availability and popularity, and growth will continue to explode as merchandise continues to be made available in new delivery formats as developing technology and ingenuity permits, as exemplified by the substantial library of "on demand" internet content now available for sale for NCAA games going back several decades.

9. The NCAA accomplishes this unreasonable restraint of trade in part by requiring all student-athletes to sign a form each year – currently known as "Form 08-3a" – that purports to require each of them to relinquish all rights in perpetuity to the commercial use of their images, including after they graduate and are no longer subject to NCAA regulations. Form 08-3a is

purposefully misleading, incomplete and ambiguous on its face, and student-athletes, including minors, must sign it under duress and without informed consent.

10. The NCAA further requires student-athletes to sign at least one other similarly illegal consent form pursuant to Article 12.5.1.1 of its Bylaws (the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement"), that allows schools and conferences to commercially exploit former student-athletes by effecting another purported perpetual release of rights. The NCAA's Bylaws contain further provisions allowing for-profit third parties to benefit financially from the commercial exploitation of former student-athletes. The penalty for a student-athlete who refuses to sign the forms described herein is that the student-athlete is declared permanently ineligible for participation on his or her respective team, unless he or she later signs the forms.

11. More specifically, Form 08-3a purports to cause student-athletes to release in perpetuity their rights to obtain compensation in connection with use by the NCAA, or the NCAA's designated "third parties," of a student-athlete's "name or picture to generally promote NCAA championships or other NCAA events, activities or programs." Similar language is contained in the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement." The NCAA, without advising its student-athletes, has taken that purposefully ambiguous language as a license to develop an array of multi-media revenue streams for itself without providing any compensation whatsoever to the former athletes whose images are sold over and over again via NCAA-owned, controlled, and licensed entities. Form 08-3a and the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement" are contracts of adhesion, imposed via anticompetitive conduct and agreement, and are plainly unenforceable.

12. The NCAA's forms in fact do not in any way grant licenses in perpetuity, or even ones extending beyond the conclusion of any student-athlete's collegiate athletics career.

1   Student-athletes have not transferred or conveyed their rights in the licensing or use of their

2   image following the cessation of their participation on NCAA teams.  The NCAA and its

3   members have no right to license or use players' images upon the conclusion of their participation

4   in intercollegiate athletics.  The NCAA and its members, however, have agreed to act as if their

5   forms do grant perpetual licenses with no limits, and further agreed to license and use the

6   wrongfully obtained rights.

7

8         13.  In addition to agreeing to wrongfully interpret the release forms as perpetual licenses,

9   the NCAA has organized, maintained, and operated an illegal horizontal cartel consisting of its

10  member schools and conferences, additionally facilitated by Defendant CLC.  That cartel has

11  collectively and illegally conspired to limit and depress the compensation of former student-

12  athletes for continued use of their images to zero.  Defendants' and their co-conspirators' actions

13  further constitute a group boycott / refusal to deal.  Their concerted action requires all student-

14  athletes to sign each year the forms described herein that purport to require each of them to

15  relinquish all rights in perpetuity for use of their images.  This concerted action is in effect a

16  refusal to deal with Class members on future post-competition rights issues.

17

18        14.  The NCAA's abridgement of former student-athletes' economic rights in perpetuity

19  is unconnected to any continuing pro-educational benefits for former student-athletes, who by

20  definition are no longer student-athletes.  Defendants' patently anticompetitive and illegal scheme

21  has unreasonably restrained trade, and is a *per se* violation of the Section 1 of the Sherman Act.

22

23        15.  In additional to violating the federal antitrust laws, Defendants have unjustly

24  enriched the NCAA, its member conferences and schools, and its for-profit business partners.

25  Defendants' actions have deprived Class members of their ability to exploit their right of

26  publicity, which protects the misappropriation of a person's identity for commercial use by

27

28

1  another, and such use can consist of the person's name, visual likeness, or other "indicia of

2  identity" such as voice, photograph, signature, or physical mannerisms.

3          16.  In September of 2008, the NCAA's President, Myles Brand, acknowledged that

4  student-athletes possess a right of publicity.  In connection with an explanation as to why the

5
   NCAA would not sue its business partner, the CBS television network, over its use of college

6
   player information in its "fantasy sports" statistical game, President Brand wrote the following:

7

8          Some have urged the NCAA to seek legal remedy to this poke in
           the eye of intercollegiate athletics. They want us to sue the
9          producers on the grounds that the use of names of student-athletes
           violates the principle of amateurism.
10

11         Well, it does.

12         But that likely isn't good enough to bring suit. The stake in the
           ground is the right to control publicity by athletes of their names,
13         likenesses and identification.  Indeed, courts might very well find
           that student-athletes should be held apart from professional athletes
14         in this application. The benefit that naturally comes with the
           publicity of names and statistics for professionals is critical enough
15         that those athletes assign their rights to organizations to manage.

16
           But in the case of intercollegiate athletics, the right of publicity is
17         held by the student-athletes, not the NCAA. We would find it
           difficult to bring suit over the abuse of a right we don't own.
18

19  The NCAA's express acknowledgement of current student-athletes' rights of publicity is equally

20  applicable to former student-athletes.

21          17.  In the NCAA's 2009 "State of the Association" speech, Wallace I. Renfro, the

22  NCAA's vice president and senior advisor to President Myles Brand, stated the following:

23
           There are commercial activities in which universities should not
24         engage even if it generates substantial revenues for athletics. A
           crystal clear example is that student-athletes should not be
25         commercially exploited. They are students, not professionals.
           Exploiting student-athletes for commercial purposes is as contrary
26         to the collegiate model as paying them.

27
           There are several orthogonal parameters that must be understood in
28         order to find the balance point for commercial activity.  These

CLASS ACTION COMPLAINT              - 7 -

> parameters include the locus of responsibility for controlling
> commercial activity, the underlying types of activity relevant to
> college sports, and the potential for diminishing or eliminating
> cases of run-away commercialism.

Whatever "orthogonal parameters" are being weighed by the NCAA and its business partners, they do not include any form of compensation to former student-athletes.

18. Reasonable and less restrictive alternatives are available than the NCAA's "zero compensation" policy for former student-athletes' licensing rights. For example, all of the major professional sports, including basketball and football, have identified and utilized group-licensing methods to share revenues among teams and players. Additionally, other reasonable and less restrictive alternatives could include the establishment of funds for health insurance, additional educational or vocational training, and/or pension plans to benefit former student athletes.

19. On behalf of the Damages Class described herein, Plaintiff seeks relief herein including monetary damages, to be automatically trebled under the federal antitrust laws; disgorgement and restitution of all monies by which the Defendants have been unjustly enriched; and declaratory relief that Form 08-3a, the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any similar forms regarding future compensation rights are void and unenforceable. Plaintiff further seeks an accounting of the monies received by Defendants, their co-conspirators, and their licensees in connection with the exploitation of Damages Class members' images, and the establishment of a constructive trust to benefit Damages Class members.

20. Plaintiff, on behalf of both former and current student-athletes, additionally requests injunctive relief permanently enjoining the NCAA from utilizing the provisions Form 08-3a, the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any similar forms that purport to deprive former student-athletes of compensation rights, and further

CLASS ACTION COMPLAINT - 8 -

1  enjoining Defendants from selling, licensing, or using former student-athletes' rights that

2  Defendants do not own.

### JURISDICTION AND VENUE

21. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367. The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the Defendants.

22. Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

23. This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletic contests, and/or licensing or selling merchandise throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Additionally, numerous NCAA Division I universities or colleges are found within this District, *i.e.*, the University of California's Berkeley campus ("Cal"), Stanford University, Santa Clara University, the University of San Francisco ("USF"), and St. Mary's College.

1

## INTRADISTRICT ASSIGNMENT

2

3

4

5

6

7

8

9

10

11

24.  This action arises in Alameda County because that is where a substantial part of the events that give rise to the claim occurred.  Within this County is found the Cal campus. The University fields at least 27 intercollegiate sports teams, including an NCAA Division I men's basketball team, and a Football Bowl Subdivision men's football team, both of which compete in the Pacific-10 Conference (the "Pac-10 Conference").  Former student-athletes on both of these teams have been, and will be, subjected to the continuing violations described herein, as are current student-athletes on those teams for purposes of the Declaratory and Injunctive Relief Class.  Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the Oakland Division.

12

13

## PLAINTIFF

14

15

16

17

18

19

20

21

22

25.  Plaintiff Sam Jacobson is a resident of Apple Valley, Minnesota.  Mr. Jacobson was a member of the University of Minnesota basketball team for the 1995 - 1998 seasons.  Mr. Jacobson competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate athletic career.  Mr. Jacobson's image, along with those of other Damages Class members, is being offered for sale and/or used during the Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

23

24

25

26.  The NCAA's On-Demand on-line store, operated in conjunction with its for-profit business partner Thought Equity Motion, sells a DVD of the 1997 NCAA tournament basketball game between the University of Minnesota and Clemson University.

26

27

28

27.  The NCAA's On-Demand on-line store, operated in conjunction with its for-profit business partner Thought Equity Motion, sells a DVD of the 1997 NCAA tournament basketball

CLASS ACTION COMPLAINT                    - 10 -

1   game between the University of Minnesota and the University of California at Los Angeles

2   (UCLA).

3        28.   The NCAA's On-Demand on-line store, operated in conjunction with its for-profit

4   business partner Thought Equity Motion, sells a DVD of the 1997 Men's National Championship

5

6   Box Set, which "includes the 1997 Final Four Highlight Video featuring Arizona, Kentucky,

7   UNC, Minnesota."

8        29.   As a result of the federal antitrust violations described herein, Plaintiff was injured in

9

10   his business or property, and was unfairly deprived of compensation in connection with the use

11   and sale of his image.

12                                    **DEFENDANTS**

13        30.   Defendant the National Collegiate Athletic Association (the "NCAA") is an

14   unincorporated association with its principal place of business located in Indianapolis, Indiana.

15        31.   Defendant Collegiate Licensing Company ("CLC") is a for-profit corporation

16   incorporated under the laws of Georgia with its principal place of business located at 290

17

18   Interstate N Circle SE, Suite 200, Atlanta, Georgia  30339.  IMG College, a division of IMG

19   Worldwide, Inc. ("IMG"), identifies CLC as its "licensing team," and states that CLC is "the

20   unrivaled leader in collegiate brand licensing, managing the licensing rights for nearly 200

21   leading institutions that represent more than $3 billion in retail sales and more than 75% share of

22   the college licensing market."   IMG identifies itself as "a leading collegiate marketing, licensing

23   and media company."

24        32.   Whenever in this Complaint reference is made to any act, deed, or transaction of the

25   Defendants, the allegation means that the Defendants engaged in the act, deed, or transaction by

26   or through their officers, directors, agents, employees, or representatives while they were actively

27

28   engaged in the management, direction, control or transaction of Defendants' business or affairs.

**CO-CONSPIRATORS**

33. Electronic Arts, Inc. ("EA") is a non-defendant co-conspirator. EA is publicly traded on the NASDAQ stock exchange (ticker symbol: ERTS) and identifies itself as "the world's leading interactive entertainment software company" and states that it "develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet." In its 2008 fiscal year, EA had revenues of $3.67 billion and 27 of its titles sold more than one million copies. As described herein, the NCAA has entered into license agreements with EA relating to the use of the likenesses of members of the Classes in video games available via various platforms.

34. Various other persons, firms, corporations, and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein, including the NCAA's member schools and conferences. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and other violations alleged herein.

35. At all relevant times, each co-conspirator was an agent of Defendants and each of the remaining co-conspirators, and in doing the acts alleged herein, was acting within the course and scope of such agency. Defendants and each co-conspirator ratified and/or authorized the wrongful acts of Defendants and each of the other co-conspirators. Defendants and the co-conspirators, and each of them, are participants as aiders and abettors in the improper acts and transactions that are the subject of this action.

**INTERSTATE TRADE AND COMMERCE**

36. The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

1       37.  During the Class Period, Defendants transacted business in multiple states in a

2   continuous and uninterrupted flow of interstate commerce throughout the United States.

3                           **CLASS ACTION ALLEGATIONS**

4

5       38.  Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3)

6   on his own behalf and on behalf of the following two classes (the "Classes"):

7   The "Declaratory and Injunctive Relief Class":

8             All current and former student-athletes residing in the United States
              who compete on, or competed on, an NCAA Division I college or
9             university men's basketball team or on an NCAA Football Bowl
              Subdivision (formerly known as Division I-A until 2006) men's
10            football team and whose images may be, or have been, licensed or
              sold by Defendants, their co-conspirators, or their licensees after the
11            conclusion of the athlete's participation in intercollegiate athletics.

12             The Class also excludes the officers, directors, and employees of
              Defendants, the officers, directors and employees of any NCAA
13            Division I college or university, and the officers, directors, or
              employees of any NCAA Division I athletic conference.

14
   The "Damages Class":
15

16             All former student-athletes residing in the United States who
              competed on an NCAA Division I college or university men's
              basketball team or on an NCAA Football Bowl Subdivision
17            (formerly known as Division I-A until 2006) men's football team
              whose images have been licensed or sold by Defendants, their co-
18            conspirators, or their licensees during the four years preceding the
              filing of this Complaint and continuing until a final judgment in this
19            matter.  The class does not include current student-athletes.

20             The Class also excludes the officers, directors, and employees of
              Defendants, the officers, directors, and employees of any NCAA
21            Division I college or university, and the officers, directors, or
              employees of any NCAA Division I athletic conference.

22
23   Members of the Damages and Declaratory and Injunctive Relief Classes are collectively referred

24   to herein as the "Class" or the "Classes" unless otherwise individually specified.

25       39.  In addition to seeking certification of nationwide classes for the antitrust claims,

26   Plaintiff also seeks certification of a nationwide class for purposes of his unjust enrichment /

27   constructive trust and accounting claims.

28

1    40.  Plaintiff does not know the exact number of Class members, because that information

2    is in the exclusive control of Defendant NCAA and third parties, namely, the NCAA's member

3    athletics conferences and schools.  However, due to the nature of the trade and commerce

4    involved, Plaintiff believes that the Class members number in the thousands and are

5    geographically diverse so that joinder of all Class members is impracticable.  Given that the

6    NCAA is selling and licensing the images of players from many decades, as described herein, it

7    stands to reason that there are more former student athletes than current ones affected by the

8    NCAA's anticompetitive practices described herein.

9

10    41.  There are questions of law and fact common to members of both the Damages Class

11    and the Declaratory and Injunctive Relief Class, including but not limited to the following:

12
13                    a.     whether Defendants and their co-conspirators engaged in or
                            entered into a contract, combination, or conspiracy among
14                          themselves to fix, depress, maintain, and/or stabilize prices
                            paid to Class members for use of their images after the
15                          conclusion of their participation in intercollegiate athletics;

16                    b.     whether Defendants' unlawful conduct has enabled them to
                            decrease, maintain, or stabilize below competitive levels
17                          the output, and compensation / royalties that Class
                            members would receive for use, of their images / likenesses
18                          in a market free of anticompetitive constraints;

19                    c.     the duration of the contract, combination, or conspiracy
                            alleged herein;
20

21                    d.     whether Defendants violated Section 1 of the Sherman Act;

22                    e.     whether Defendant NCAA's Form 08-03a, and any similar
                            forms, are void and unenforceable;
23
                      f.     whether Defendant NCAA's "Institutional, Charitable,
24                          Educational, or Nonprofit Promotions Release Statement,"
                            and any similar forms, are void and unenforceable; and
25

26                    g.     whether the conduct of Defendants and their co-
                            conspirators caused injury to the business or property of
27                          Plaintiff and Class members.

28

CLASS ACTION COMPLAINT              - 14 -

42. Additional common questions of law of fact specific to the Damages Class include the following:

  a. the appropriate measure of damages sustained by Plaintiff and Class members; and

  b. whether Defendants have been unjustly enriched.

43. The common questions with respect to the Damages Class predominate over questions, if any, that affect only individual Damages Class members.

44. With respect to the Declaratory Relief and Injunctive Relief Classes, common questions of law or fact include the following:

  a. whether injunctive relief is appropriate;

  b. if injunctive relief is appropriate, what types of such relief are suitable in this matter;

  c. whether declaratory relief is appropriate;

  d. whether a constructive trust for the benefit of class members should be established; and

  e. whether an accounting is appropriate.

45. With respect to members of the Declaratory and Injunctive Relief Class, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

46. Plaintiff's claims are typical of, and not antagonistic to, the claims of the other Class members. By advancing his claims, Plaintiff will also advance the claims of all Class members, because Defendants participated in activity that caused all Class members to suffer similar injuries.

47. Plaintiff and his counsel will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiff's claims and those of absent

1   Class members that would make class certification inappropriate. Counsel for Plaintiff are highly

2   experienced in complex class action litigation, including antitrust litigation, and will vigorously

3   assert Plaintiff's claims and those of absent Class members.

4       48.  A class action is superior to other methods for the fair and efficient resolution of this

5   controversy.  The class action device presents fewer management difficulties, and provides the

6   benefit of a single adjudication, economy of scale, and comprehensive supervision by a single

7   court.  The damages suffered by Plaintiff and each Damages Class member are relatively small as

8   compared to the expense and burden of individual prosecution of the claims asserted in this

9   litigation.  Thus, absent class certification, it would not be feasible for Plaintiff and Class

10  members to redress the wrongs done to them.  It also would be grossly inefficient for the judicial

11  system to preside over large numbers of individual cases.  Further, individual litigation presents

12  the potential for inconsistent or contradictory judgments and would greatly magnify the delay and

13  expense to all parties and to the judicial system.  Therefore, the class action device presents far

14

15  fewer case management difficulties and will provide the benefits of unitary adjudication,

16  economy of scale, and comprehensive supervision by a single court.

17

18

19  ## THE NCAA AND ITS CONTROL OF THE COLLEGIATE LICENSING MARKET

20      49.  Each year, the colleges and universities who are members of the NCAA award more

21  than 11,500 athletic scholarships to men's football and basketball players.

22      A.      **The NCAA and its Structure and Governance.**

23      50.  In its most recent Consolidated Statement of Financial Position, dated August 31,

24  2008, the NCAA stated the following:

25          The National Collegiate Athletic Association (the NCAA or the
26          Association) is an unincorporated not-for-profit educational
            organization founded in 1906.  The NCAA is the organization
27          through which the colleges and universities of the nation speak and
            act on athletics matters at the national level.  It is a voluntary
28

CLASS ACTION COMPLAINT                - 16 -

1

2

3

4

5

6

association of more than 1,000 institutions, conferences and organizations devoted to the sound administration of intercollegiate athletics in all its phases.  Through the NCAA, its members consider any athletics issue that has crossed regional or conference lines and is national in character.  The NCAA strives for integrity in intercollegiate athletics and serves as the colleges' national athletics accrediting agency.  A basic purpose of the NCAA is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body.

7

8

9

10

11

12

13

14

15

16

The NCAA operates through a governance structure which empowers each division to guide and enhance their ongoing division-specific activities.  In Division I, the legislative system is based on conference representation and an eighteen member Board of Directors that approves legislation.  The Division II and III presidential boards are known as the Presidents Council; however, legislation in Division II and III is considered through a one-school, one-vote process at the NCAA Annual Convention. The governance structure also includes an Executive Committee composed of sixteen chief executive officer (member institution chief executive officers) that oversee association-wide issues which is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies and general principles of the NCAA. The Executive Committee has representation from all three divisions and oversees the Association's finances and legal affairs.

17    51.  On its website, the NCAA further describes itself as being "comprised of institutions,

18  conferences, organizations and individuals committed to the best interests, education and athletics

19  participation of student-athletes."  The NCAA further states that its members are the "colleges,

20  universities and conferences that make up the NCAA," and that "[t]he members appoint volunteer

21

22  representatives that serve on committees which introduce and vote on rules called bylaws. The

23  members also establish programs to govern, promote and further the purposes and goals of

24  intercollegiate athletics."  The NCAA additionally states "[m]any believe the Association rules

25  college athletics; however, it is actually a bottom-up organization in which the members rule the

26  Association."

27

28

52.   The 2008-09 NCAA "Division I Manual" is comprised of the NCAA's Constitution,

its Operating Bylaws, and its Administrative Bylaws, which together span more than 400 pages.

These rules regulate all aspects of collegiate athletic competition, and demonstrate the NCAA's

control of the collegiate licensing market and the horizontal agreements by which the NCAA's

members agree to abide by, implement, and enforce the rules.

B.     **The NCAA's Anticompetitive Form 08-3a.**

53.   Bylaw 12.5.1.1.1 ("Promotions Involving NCAA Championships, Events, Activities

or Programs") states the following:

> The NCAA [or a third party acting on behalf of the NCAA (e.g.,
> host institution, conference, local organizing committee)] may use
> the name or picture of an enrolled student-athlete to generally
> promote NCAA championships or other NCAA events, activities or
> programs.

54.   Before a student-athlete commences athletic participation each year, the NCAA

requires that he or she sign its "Form 08-3a." titled "Student-Athlete Statement."  The form is of

particular importance due to its provision regarding student-athletes' release of rights in

connection with use of their images. It appears that the title of this form changes each year in

connection with the applicable year.

55.   The mandatory nature of the form on which student-athletes must agree to the terms

of Bylaw 12.5.1.1.1 is detailed in the Constitution and Bylaws.  Specifically, Article 3.2.4.6 of the

Constitution ("Student-Athlete Statement") states the following:

> An active member shall administer annually, on a form prescribed
> by the Legislative Council, a signed statement for each student-
> athlete that provides information prescribed in Bylaws 14.1.3 and
> 30.12.

56.   Bylaw 14.1.3.1 ("Content and Purpose"), referred to in Article 3.2.4.6 of the

Constitution, details the contents of the required form and states the following:

CLASS ACTION COMPLAINT                         - 18 -

1
2
3
4
5
6
7
8
9

> Prior to participation in intercollegiate competition each academic
> year, a student-athlete shall sign a statement in a form prescribed by
> the Legislative Council in which the student athlete submits
> information related to eligibility, recruitment, financial aid, amateur
> status, previous positive drug tests administered by any other
> athletics organization and involvement in organized gambling
> activities related to intercollegiate or professional athletics
> competition under the Association's governing legislation. Failure
> to complete and sign the statement shall result in the student-
> athlete's ineligibility for participation in all intercollegiate
> competition. Violations of this bylaw do not affect a student-
> athlete's eligibility if the violation occurred due to an institutional
> administrative error or oversight, and the student-athlete
> subsequently signs the form; however, the violation shall be
> considered an institutional violation per Constitution 2.8.1.

10
11

57.  Bylaw 14.1.3.2 ("Administration") continues that "[t]he institution shall administer

this form individually to each student-athlete prior to the individual's participation in

12
13

intercollegiate competition each year. Details about the content, administration, and disposition of

14

the statement are set forth in Bylaw 30.12."

15

58.  Bylaw 30.12 ("Student-Athlete Statement"), referred to in Article 3.2.4.6 of the

16

Constitution and in Bylaw 14.1.3.2, states the following:

17
18

> The following procedures shall be used in administering the
> student-athlete statement required in Bylaw 14.1.3:

19
20
21

> (a)  The statement shall be administered individually to each
> student-athlete by the athletics director or the athletics
> director's designee prior to the student's participation in
> intercollegiate competition each academic year;

22
23

> (b)  The statement shall be kept on file by the athletics director and
> shall be available for examination upon request by an
> authorized representative of the NCAA; and

24
25
26

> (c)  The athletics director shall promptly notify in writing the vice
> president of NCAA's education services group regarding a
> student-athlete's disclosure of a previous positive drug test
> administered by any other athletics organization.

27

59.  Form 08-3a states that it is "required by NCAA Constitution 3.2.4.6 and NCAA

28

Bylaws 14.1.3.1 and 30.12," and that its purpose is "[t]o assist in certifying eligibility." It further

CLASS ACTION COMPLAINT                          - 19 -

1   notes that "[t]his NCAA Division I statement/consent form shall be in effect from the date this

2   document is signed and shall remain in effect until a subsequent Division I Student-Athlete

3   Statement/Drug-Testing Consent form is executed." Form 08-3a has seven parts, including the

4   following: "[a]statement concerning eligibility;" "[a]n affirmation of status as an amateur

5

6   athlete;" and "[a] statement concerning the promotion of NCAA championships and other NCAA

7   events."

8        60. Under Part IV ("Promotion of NCAA Championships, Events, Activities or

9   Programs"), student athletes must sign and agree to the following:

10           You authorize the NCAA [or a third party acting on behalf of the
             NCAA (e.g., host institution, conference, local organizing
11           committee)] to use your name or picture to generally promote
             NCAA championships or other NCAA events, activities or
12           programs.

13

14       61. Part IV, described in the preceding paragraph, has been utilized by the NCAA, its

15   members, and its co-conspirators to engage in the unlawful licensing of Class members'

16   commercial rights. Its provision stating that it "shall remain in effect until a subsequent Division

17   I Student-Athlete Statement/Drug-Testing Consent form is executed" has the effect of granting a

18   purported release in perpetuity.

19       62. Notably, Form 08-3a states that it is "required by NCAA Constitution 3.2.4.6 and

20
     NCAA Bylaws 14.1.3.1 and 30.12" and that its purpose is to "assist in certifying eligibility." The
21

22   referenced sections of the Constitution and Bylaws, however, do not convey, transfer, or grant

23   any rights of the student-athlete to the NCAA, its member institutions, or its licensees. The

24   sections referenced regarding the Constitution and Bylaws have to do with matters concerning

25   eligibility, disclosure of educational and drug testing records, and affirmation of amateur status

26   requirements. Relying on these provisions, the NCAA has created an anti-competitive and

27   unconscionable perpetual release relating to image rights.

28

CLASS ACTION COMPLAINT              - 20 -

63. The "authorization" described above in Form 08-3a is entirely coerced and uninformed and is even signed, in some cases, by minors.

64. Form 08-3a is evidence of the NCAA's repeated attempts to obfuscate issues about sales of merchandise by referring to the vague and ambiguous concept of "promot[ion] of NCAA championships or other NCAA events, activities or programs of college athletics." The ambiguous word "support" also appears in the "Institutional, Charitable, Education or Nonprofit Promotions Release" mandated by Article 12.5.1.1 of the Bylaws. No reasonable person, upon reading Form 08-3a, and the "Institutional, Charitable, Education or Nonprofit Promotions Release" described below, would interpret phrases such as "support educational activities," or "generally promote NCAA championships or other NCAA events, activities or programs" to specifically grant a license in perpetuity for former players' images to be used for profit, over many years, in DVDs, on-demand video, video games, photographs for sale, "stock footage" sold to corporate advertisers, "classic games" for re-broadcast on television, jersey and apparel sales, and other items.

65. The NCAA's releases described herein are also notable for their failure to indicate that legal rights are being relinquished, and for their failure to counsel student-athletes, who are sometimes minors, that they may wish to seek legal advice in connection with the release of future compensation rights.

66. This is not the first occasion in which the NCAA has sought to prevent input from legal counsel on matters that affect student-athletes' post-collegiate endeavors. In a recent Opinion dated February 12, 2009, in the matter of *Oliver v. National Collegiate Athletic Association ("Oliver")*, Judge Tygh M. Tone of the Common Pleas Court of Erie County, Ohio, examined the NCAA's Bylaw 12.3.2.1. That Bylaw states that "A lawyer may not be present during discussions of a contract offer with a professional organization or have any direct contact

(in person, by telephone or by mail) with a professional sports organization on behalf of the individual. A lawyer's presence during such discussions is considered representation by an agent." A player utilizing an "agent" in such negotiations is deemed ineligible under the NCAA's rules, whereas one who does not utilize an agent can retain his eligibility if he chooses to return to school and not become a professional.  The court ruled that "Bylaw 12.3.2.1 is arbitrary and capricious and against the public policy of the State of Ohio as well as all states within this Union and further limits the player's ability to effectively negotiate a contract."

67.  The court in *Oliver* further stated that the effect of the Bylaw "is akin to a patient hiring a doctor but the doctor is told by the hospital board and the insurance company that he (the doctor) cannot be present when the patient meets with a surgeon because the conference may improve his patient's decision making power."  The court additionally stated that "[i]f the Defendant [NCAA] intends to deal with this athlete or any athlete in good faith, the student-athlete should have the opportunity to have the tools present (in this case an attorney) that would allow him to make a wise decision without automatically being deemed a professional, especially when such contractual negotiations can be overwhelming, even to those who are skilled in their implementation."

68.  The NCAA, through its total control of intercollegiate athletics, and due to a gross disparity in bargaining power, requires student-athletes to sign nonnegotiable forms, as the terms are nonnegotiable.  Any Class member declining to do so is barred by the NCAA and the relevant member institution from all further intercollegiate athletic competition.

C.  **The NCAA's Anti-Competitive "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement" Mandated by NCAA Bylaws Section 12.5.1.1.**

69.  Article 12.5.1.1 ("Institutional, Charitable, Education or Nonprofit Promotions") also results in the creation of an unconscionable release that benefits member schools and conferences.

CLASS ACTION COMPLAINT                            - 22 -

1    This release also is the product of the anticompetitive agreement described herein among the

2    NCAA and its members.  Article 12.5.1.1 states in pertinent part the following:

3            A member institution or recognized entity thereof (e.g., fraternity,
4            sorority or student government organization), a member conference
             or a non-institutional charitable, educational or nonprofit agency
5            may use a student-athlete's name, picture or appearance to support
             its charitable or educational activities or to support activities
6            considered incidental to the student-athlete's participation in
             intercollegiate athletics, provided the following conditions are met:
7

8        (a)  The student-athlete receives written approval to participate
              from the director of athletics (or his or her designee who may
9             not be a coaching staff member), subject to the limitations on
              participants in such activities as set forth in Bylaw 17;
10

11       (b)  The specific activity or project in which the student-athlete
              participates does not involve co-sponsorship, advertisement or
12            promotion by a commercial agency other than through the
              reproduction of the sponsoring company's officially registered
13            regular trademark or logo on printed materials such as pictures,
              posters or calendars. The company's emblem, name, address,
14            telephone number and Web site address may be included with
              the trademark or logo. Personal names, messages and slogans
15            (other than an officially registered trademark) are prohibited;

16
         (c)  The name or picture of a student-athlete with remaining
17            eligibility may not appear on an institution's printed
              promotional item (e.g., poster, calendar) that includes a
18            reproduction of a product with which a commercial entity is
              associated if the commercial entity's officially registered
19            regular trademark or logo also appears on the item;

20
         (d)  The student-athlete does not miss class;
21

22       (e)  **All moneys derived from the activity or project go directly
              to the member institution, member conference or the**
23            **charitable, educational or non-profit agency** (emphases
              added);
24

25       (f)  The student-athlete may accept actual and necessary expenses
              from the member institution, member conference or the
26            charitable, educational or nonprofit agency related to
              participation in such activity;
27

28       (g)  The student-athlete's name, picture or appearance is not used
              to promote the commercial ventures of any nonprofit agency;

CLASS ACTION COMPLAINT                    - 23 -

(h) Any commercial items with names, likenesses or pictures of multiple student-athletes (other than highlight films or media guides per Bylaw 12.5.1.7) may be sold only at the member institution at which the student-athletes are enrolled, institutionally controlled (owned and operated) outlets or outlets controlled by the charitable or educational organization (e.g., location of the charitable or educational organization, site of charitable event during the event). Items that include an individual student-athlete's name, picture or likeness (e.g., name on jersey, name or likeness on a bobble-head doll), other than informational items (e.g., media guide, schedule cards, institutional publications), may not be sold; and

(i) **The student-athlete and an authorized representative of the charitable, educational or nonprofit agency sign a release statement ensuring that the student-athlete's name, image or appearance is used in a manner consistent with the requirements of this section**. (emphasis added).

70. The preceding Bylaw, with its mandated release pursuant to subsection (i), has been utilized by the NCAA's members to engage in the unlawful licensing of Class members' rights, as intended by the NCAA. Just as described herein with respect to the NCAA's Form 08-3a, this mandated release constitutes an unconscionable contract that is both procedurally and substantively unconscionable.

71. Bylaw 12.5.1.7 ("Promotion by Third Party of Highlight Film, Videotape or Media Guide") states the following:

Any party other than the institution or a student-athlete (e.g., a distribution company) may sell and distribute an institutional highlight film or videotape or an institutional or conference media guide that contains the names and pictures of enrolled student-athletes only if:

(a) The institution specifically designates any agency that is authorized to receive orders for the film, videotape or media guide;

(b) Sales and distribution activities have the written approval of the institution's athletics director;

(c) The distribution company or a retail store is precluded from using the name or picture of an enrolled student-athlete in any

poster or other advertisement to promote the sale or
distribution of the film or media guide; and

(d)     There is no indication in the makeup or wording of the
advertisement that the squad members, individually or
collectively, or the institution endorses the product or services
of the advertiser."

72.     The above-provision appears to purport to give third parties (meaning for-profit

"distribution companies") the right to "sell and distribute" highlight films upon approval from the

school, without even mandating a release from the student-athlete. However, the release that the

NCAA mandates in its Bylaw 12.5.1.1(h), described a few paragraphs above, has been utilized by

the NCAA and its members to unlawfully license and use the commercial rights of former

student-athletes' rights in the use of their images.

73.     The *Des Moines Register* recently confirmed that schools do in fact require student-

athletes to sign the NCAA's mandated consent forms, and reported the following in an article that

also described two schools' receipt of funds relating to the NCAA's video-game license

agreement with EA (as further detailed herein):

The athletic departments for Iowa and Iowa State ask for student-
athletes' consent before using their likeness on any promotional
material for the schools.

"Generally, the way we approach it is we've been very conservative
over the years," Iowa athletic director Gary Barta said. "When we
do sell the likeness of a student-athlete, we have signed permission
... and all the proceeds from those sales go back directly to benefit
student-athletes in general (through the school's athletic fund)."

The "consent" and "permission," described above, however, is entirely coerced and uninformed,

as intended by the NCAA and its business partners - its member schools, conferences, and for-

profit licensees, and as such constitutes an unconscionable contract and is the product of

anticompetitive conduct and agreement.

D.  **The Collegiate Licensing Market.**

74.  The NCAA and its members control the collegiate licensing market in the United States, including licensing rights to current and former players' images and likenesses (which are utilized in, for example, items such as DVDs of game films, on-demand sales of game films, "stock footage" for corporate advertisers, "classic" games shown on the cable television network "ESPN Classic" and other networks, photographs, video games, and in other merchandise).

75.  IMG, the owner of the NCAA's licensing arm, Defendant CLC, recognizes the college market on its website as follows: "IMG College is a leading collegiate marketing, licensing and media company that can create and build comprehensive marketing platforms that leverage the marketing potential of the college sports and on-campus market. " IMG continues that "[c]onsumer devotion to college institutions is unrivaled, but the complexity of the space makes it challenging for marketers to tap the full potential. With our expertise, broad relationships and portfolio of properties, IMG College can help brands create platforms to reach millions of passionate, loyal fans." IMG further states that "[o]ur licensing team, The Collegiate Licensing Company, is the unrivaled leader in collegiate brand licensing, managing the licensing rights for nearly 200 leading institutions that represent more than $3 billion in retail sales and more than 75% share of the college licensing market." IMG on its website further states: "[h]aving originally contracted with IMG College in 1976, the NCAA has trusted the Company for nearly 30 years to lead the industry in delivering the power of the collegiate market to consumers nationwide."

76.  The NCAA and its members have the ability to control price and exclude competition. The NCAA and its members control the output and set the price for licensed merchandise and licensing rights and have the power to exclude from this market any member who is found to violate its rules. The NCAA can and does exclude both current and former

1   student-athletes from this market, as evidenced by the usage of the anticompetitive forms

2   described herein. The NCAA and its members have obtained a 100% share in the licensing

3   market. With respect to current student-athletes, those players would collectively have a share of

4   that market absent the vehicles described herein by which they are required to transfer those

5   
6   rights to the NCAA, its members, and others. Former student-athletes, including the members of

7   the Damages Class described herein, also would have a share of the market, absent the

8   anticompetitive practices described herein.

9       77. The NCAA (through its members) thus totally controls the licensing rights market,

10  and is able to dictate the supply and the terms upon which licensed products and licenses are

11  bought and sold.

12  
13      78. Another indicator of the NCAA and its members' power include the fact that *all*

14  student-athletes are required to sign the forms described herein and pursuant to which the NCAA

15  has unlawfully licensed the rights of former student-athletes are forced to release all future rights

16  to the commercial use of their images. Student-athletes must sign these forms, even if he or she

17  does not receive a scholarship. The NCAA has the power to impose and enforce the releases, and

18  to exclude non-signing athletes from participation in all future intercollegiate competition, as well

19  
20  as penalize schools whose athletes violate the terms of the forms and related rules, regardless of

21  whether the athlete receives any scholarship funds.

22      79. The NCAA, through its member schools, imposes a wide variety of conditions on

23  student-athletes. For example, they may not receive compensation beyond educational expenses

24  approved by the NCAA; they may not retain an agent for exploitation of their future professional

25  career; they must meet minimum requirements for educational progress; and they are strictly

26  limited in receiving compensation for non-athletic services that might be understood to reflect on

27  
28  their athletic ability. If student-athletes had the opportunity to receive a college education and

compete at an elite level of intercollegiate competition without these restrictions, many student-athletes would choose to do so. The fact that they agree to these conditions demonstrates the market power of the NCAA member schools, i.e., the lack of any reasonable substitute for those who wish to receive a college education and compete in elite intercollegiate athletic competition.

80. The demand for student-athletes is such that, absent the unlawful Form 08-3a, the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any other similar device that the NCAA has utilized to attempt to eliminate compensation owed to former student-athletes, the colleges and universities participating in the relevant markets would have competed against each other by offering higher amounts of post-graduation licensing revenues to student athletes. For example, schools, in order to compete with each other, could offer players a portion of the revenue that the schools in turn receive via the NCAA and other sources for commercial exploitation of those players' images. But under current anticompetitive conditions, compensation is "capped" at zero by artificial rules imposed by the NCAA that result in lower compensation than would otherwise prevail in a more competitive market.

81. Thus, for the members of the proposed Damages Class, increased competition on the terms of post-career revenue distribution for former athletes would result in additional revenue for all members of the proposed class.

82. All NCAA members have agreed to utilize and abide by the NCAA's Bylaws, including the provisions detailed herein that mandate the use of Form 08-3a and the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement" discussed herein, which have been used by the NCAA and its member institutions and conferences to fix the prices at which former student-athletes are paid for their commercial licensing rights or foreclosed from exercising any such rights.

83. The NCAA and its members are able to engage in these anticompetitive agreements and arrangements, as there are no acceptable substitutes for major college football or major college basketball.

84. The agreement among NCAA member schools to jointly appropriate student-athletes' rights after the expiration of the students' eligibility as an amateur athlete is not necessary to achieve the NCAA's stated goal of clearly demarcating between college and professional sports, or to serve any pro-educational purpose, or any other legitimate, pro-competitive purpose in the marketing of college sports.

85. Moreover, reasonable and less restrictive alternatives are available than the NCAA's "zero compensation" policy for former student-athletes' licensing rights. For example, all of the major professional sports, including basketball and football, have identified and utilized group-licensing methods to share revenues among teams and players. Additionally, other reasonable and less restrictive alternatives could include the establishment of funds for health insurance, additional educational or vocational training, and/or pension plans to benefit former student athletes.

## FACTUAL ALLEGATIONS

### A. The NCAA's 2009 "State of the Association" Speech Regarding Commercial Exploitation of Student-Athletes.

86. As noted above in the Introduction, Wallace Renfro, the NCAA's vice president and senior advisor to President Myles Brand gave its 2009 "State of the Association" speech. Mr. Renfro's remarks are notable for the contrast with the NCAA's actual conduct in exploiting former student-athletes, and his acknowledgment that "[g]eneration of much needed revenue does not justify the exploitation of student-athletes." Certainly the same holds true with respect to former student-athletes. Specifically, Mr. Renfro's remarks included the following:

CLASS ACTION COMPLAINT                    - 29 -

Any adequate policy of commercial activity must ensure that student-athletes are not commercially exploited.

Call this the condition of non-exploitation.

This condition is further delineated in the paper you received as you arrived today. When we say "student-athlete exploitation in commercial activity," we should have a specific definition in mind.

Since student-athletes are amateurs, not paid professionals, they cannot accept payment for endorsing or advertising any commercial product or service.

It also means they should not be put in a position in which the natural interpretation by a reasonable person is that they are endorsing or advertising a commercial product or service.

But most cases of exploitation are subtle and indirect.

Instead of obvious product endorsement, the marketing can include game pictures, films, audio or video of student-athletes that make it appear to a reasonable person that a student-athlete is endorsing a specific commercial product.

The student-athlete may well have no knowledge or awareness that his or her reputation, image or name is being used for these commercial purposes.

But exploitation may be the result, nonetheless.

Generation of much needed revenue does not justify the exploitation of student-athletes.

We can – and we should – debate the nature of proper commercial conduct. However, one principle is not subject to debate: commercial exploitation of student-athletes is not permissible.

Period.

B.    **The NCAA's Web of Licensing Agreements With For-Profit Entities.**

87.  In the early 1980s, the total retail market for products identified with college athletics was estimated to be under $100 million per year. The typical outlets for such sales were college book stores or other campus locations. In the mid-1990s, the market was estimated to have grown to $2.5 billion per year, with the predominant sales locations being retail and chain stores. IMG now estimates that the market is a $4.0 billion per year. The growth of the market has been

CLASS ACTION COMPLAINT                - 30 -

1   explosive, and advances in technology and product delivery outlets, namely, the internet, cable

2   television delivery systems, and video game technology advances, have accelerated the growth.

3       88. A review of even the limited public information available regarding the NCAA's

4   financial operations details the explosive growth in revenue that it has received in connection

5   with sales of NCAA-related merchandise. In its 2002-2003 Revenue Report, the NCAA listed

6   receipt of "royalties" of $3.8 million, and $6.2 million in "sales and services" (along with $370

7   million in television revenue).

8

9       89. In its 2007-08 report, the NCAA listed $552 million in total revenue for "television

10  and marketing rights fees" of which $529 million was elsewhere attributed to revenues from its

11  television contract with CBS, leaving an apparent $23 million difference attributable to royalties.

12  Additionally, the NCAA reported approximately $14.5 million in revenue for "sales and

13  services." Thus, in just a few years, it appears that the combination of royalties and sales and

14  services went from $10 million for the 2002-03 fiscal year ($3.8 million plus $6.2 million), to

15  $37.5 million ($23 million plus $14.5 million) in for the 2007-08 fiscal year. That number only

16  represents the NCAA's portion obtained pursuant to currently unknown royalty rates, and does

17  not represent the total value of the associated sales via the NCAA's licensees, or sales made by

18  member conferences and schools of goods.

19

20

21      90. Within recent years the NCAA has entered into some of the licensing partnerships

22  detailed herein that unlawfully utilize the images of Class members. The related available content

23  featuring likeness of former student-athletes, such as DVDs, photos, and video games, continues

24  to grow in both availability and popularity, and growth will continue to explode as merchandise

25  continues to be made available in new delivery formats as developing technology and ingenuity

26  permits, as exemplified by the substantial library of "on demand" internet content now available

27  for sale for NCAA games going back several decades.

28